[Civil No. 2833. Filed February 24, 1930.]

[285 Pac. 277.]

MILLER CATTLE COMPANY, a Corporation, Appellant, v. E. R. CHAMBERS, Appellee.

Messrs. Kibbey, Bennett, Gust, Smith & Lyman, for Appellant.

Messrs. Clark & Clark, for Appellee.

ROSS, J.—Plaintiff, Chambers, brought this action for brokerage commissions for selling feed and

pasturage belonging to the defendant, Miller Cattle Company, to Campbell-Francis Sheep Company. The defense is that Chambers had no contract and was not the proximate or procuring cause of such sale.

The case was tried to a jury and resulted in a verdict and judgment for plaintiff. Defendant appeals.

The contract of employment was not in writing and the evidence of it is conflicting. The conflict was by the jury resolved by their verdict in favor of the existence of the contract, and that we shall regard as settled, as under the evidence a verdict for either side would be sustained.

The plaintiff testified that late in July or early August, 1927, he met S. C. Miller, president of the defendant company, in the Commercial Hotel in Flagstaff, who told him he had been trying for some days to sell his feed and pasturage to sheepmen, but that he had not been successful; that he could feed on defendant's premises 6,000 head of sheep, and that his price was seventy-five cents per head per month for the first three months and ninety cents per head per month for any longer time the feed and pasturage was used. Plaintiff testified that, after Miller had stated prices, "I told Mr. Miller . . . that I thought I could place it for him and would try my best to do so for the 5% commissions that I had always gotten for those transactions, and he told me to do it and I did it." At another place, explaining the contract with defendant, he testified: "He (Miller) gave me authority to sell it . . . and he would give me this commission if I could sell it at that price." That under the agreement his commissions were to become due and payable as and when the purchase price was paid; that Miller said to him he was going home (Phoenix) that day or

next, and if he found a buyer to call him before he came down or sent anyone, because he was not there all the time. He testified he found a buyer and telephoned Miller. The buyer referred to was a sheep owner of the name of Nathan Bankhead living at that time at Nevins, about fourteen miles west of Flagstaff. Plaintiff testified that after his conversation with Miller he drove to Bankhead's home and presented to him the Miller offer, and that Bankhead stated that if the Miller feed and pasturage was as represented he would take it; that thereafter by telephone and telegraph he advised Miller that Bankhead would come to Phoenix on a day named and see him.

It is unquestioned that on August 16th or 17th Bankhead, Dan Francis, Jack Duerson and Miguel Chivarria, all sheepmen in quest of winter feed and pasturage, came to Phoenix in Bankhead's automobile, where Miller joined them and went to the defendant's ranch at Buckeye, about thirty-five miles west of Phoenix. Bankhead did not buy the Miller feed and pasturage, but on the day following the visit to the Miller ranch Dan Francis, as the surviving partner of the Campbell-Francis Sheep Company, did purchase the feed and pasturage of defendant, and thereafter and before the bringing of this suit paid therefor the sum of $18,000.

Bankhead, testifying in behalf of plaintiff, was permitted to state what he said to plaintiff Chambers when the latter told him of the defendant's offer, as follows: "I will go down and see Mr. Miller and if it is that way I will get the feed and take somebody else to take it from me. . . . I told Mr. Chambers if the price was as he represented it we would go down to look at the feed, and if we would accept it, if I couldn't handle it myself I would get somebody else to help me." Bankhead also stated that he would

have taken the Miller offer if it had not been taken by the Campbell-Francis Sheep Company.

As above indicated, it appears from the evidence that three sheep outfits were represented by the men who went from Flagstaff to Phoenix and with Miller to the Miller ranch. They were all looking for winter feed for their flocks. Bankhead wanted feed and pasturage for 4,000, Campbell-Francis Sheep Company for 8,000, and Chivarria for —— head. The Miller feed and pasturage would care for 6,000 head. It was more than Bankhead wanted or needed, and although he had assured plaintiff, as he says, he would take it if he found it as represented and if he couldn't handle it himself would get someone else to help him, the fact is he did not take it nor make an offer to take it and did not with the assistance of anyone else take it. Bankhead got other feed and pasturage at Arlington, ten or twelve miles south of Buckeye. Campbell-Francis Sheep Company, through the co-operation of S. C. Miller, president of defendant, arranged with two other ranch owners in the neighborhood of the Miller ranch to buy feed and pasturage, which together with the Miller feed and pasturage met their needs, and they thereupon bought the Miller feed and pasturage.

Stripped of detail, the ultimate facts are the plaintiff brought to the attention of Bankhead the Miller feed and pasturage and made an appointment with S. C. Miller, president of defendant, for Bankhead to see the latter about a purchase thereof. Bankhead went from Flagstaff to Phoenix to meet such appointment and took with him representatives of two other sheep outfits, one of which bought the feed and pasturage. The purchaser, however, had not been introduced to the defendant by the plaintiff, and the plaintiff knew nothing of such purchase or purchaser until some time after the consummation of

the sale. There is nothing in the evidence showing or indicating that plaintiff had anything to do with or knew that Bankhead intended or would take any prospective purchasers of the Miller feed and pasturage with him to see Miller about such feed and pasturage. No notice of that kind was sent to Miller. Neither does it appear that Bankhead before leaving Flagstaff or on the way to Phoenix told Campbell-Francis Sheep Company of the Miller feed and pasturage or mentioned the price at which it had been quoted to him by Chambers. If he said or did anything prior or subsequent to their meeting Miller to interest the Campbell-Francis Sheep Company in the Miller feed and pasturage, it is not reflected in the evidence. So far as the record shows, Bankhead's act in furnishing transportation was voluntary and for the accommodation of the other sheepmen who accompanied him.

At the close of the case, one of the requests of defendant was that the jury be instructed to return a verdict for defendant, and the refusal to give this instruction is assigned as error. It is claimed the evidence fails to show that plaintiff was the efficient and procuring cause of the sale to the Campbell-Francis Sheep Company and, such being the case, the request should have been granted. It is just as essential that the broker prove that the sale made was made through his personal efforts or by means employed by him, as that he was engaged by the owner to make the sale. Proof of employment and that a sale was made will not entitle a broker to commissions. He must go further and show that he was in fact the procuring cause of the sale. Now, if the sale to Campbell-Francis Sheep Company was contributed to by the plaintiff, such contribution was through the act of Bankhead, whom he had interested in the Miller feed and pasturage; that being the only act connecting plaintiff with the sale. If

the plaintiff was instrumental in bringing the seller and buyer together, it was through Bankhead. The plaintiff had presented the property to no one else—certainly not to the buyer, for the plaintiff knew nothing of the sale or the negotiations leading to the sale until some time after it was completed. It is quite apparent that Bankhead did not assume to act for plaintiff in informing Campbell-Francis Sheep Company that the Miller feed and pasturage was for sale. He insists that when he and Francis and Chivarria went to examine the feed and pasturage, that he did so with the intention of buying it himself and if he found it more than he needed to interest some other purchaser not named to take part of it off his hands. Neither does it appear anywhere that plaintiff intended to use Bankhead as an instrument or means of reaching the Campbell-Francis Sheep Company. Plaintiff merely talked about the property with Bankhead, and Bankhead of his own accord probably mentioned to the purchaser that the Miller feed and pasturage was for sale.

What is and what is not considered the procuring cause of sale by a broker when he has had no direct communication with the buyer is well defined in *Gleason* v. *Nelson,* 162 Mass. 245, 38 N. E. 497, as follows:

"The general rule of law applicable to a case like this is that, where there has been no direct communication between the broker and the purchaser, it must be shown affirmatively that the latter was induced to enter into the negotiations which resulted in the purchase through the means employed by the broker for that purpose. If the broker employed other persons to aid him, whether under pay or not, or if he put up maps, signs, notices, or otherwise advertised the property, by means of which a person was induced to open negotiations with the owner which resulted in his buying the property, the sale may be said to have been effected through the broker's in-

strumentality. But it must be made to appear that what the broker did was the immediate and efficient cause of such negotiations. If the broker merely talked about the property with different persons, and one of them, of his own accord, and not acting in behalf of the broker, mentioned to another that the property was for sale, and such last-mentioned person thereupon looked into the matter, and finally became the purchaser, the agency of the broker in inducing the sale was not sufficiently direct to entitle him to a commission.''

In the almost numberless cases found in the books involving brokers' commissions, there are very few in which the broker and the purchaser have not personally or by representation had communication with each other before or during the negotiations of the sale. The very purpose of a broker's agency is to locate and interest prospective purchasers of his principal's property. If the agency is not exclusive, the owner may sell his property to anyone not found by the broker. There is no suggestion that the broker in this case had the exclusive right to sell the Miller feed and pasturage. The contract pleaded shows the contrary. We do not think the facts show the purchaser Campbell-Francis Sheep Company was found by the plaintiff. Of the various means that plaintiff might have employed to find a purchaser, he employed only personal solicitation. He saw and interested Bankhead. He did not see and interest the purchaser of the Miller feed and pasturage. If, notwithstanding, Bankhead went as he says to the Miller ranch intending to buy for himself, he might be regarded as an instrumentality of the plaintiff, still there is an entire absence of evidence that the Miller feed and pasturage was ever presented to the purchaser by Bankhead. The evidence does not show that Bankhead even told the purchaser that the Miller feed and pasturage was for sale, or its

size, fitness, or adaptability, or the price that would have to be paid for it.

In *A. Arent Co.* v. *Cinnamon,* (Sup.) 188 N. Y. Supp. 86, 87, the broker sent a notice to one M. that he had certain real estate for sale. M.'s wife and a Mrs. L. and another lady went with the broker's representative to look at the property. The representative quoted no price or terms of sale, simply showed the property. Thereafter the husband of Mrs. L. purchased the property directly from the owner, and the broker sued the latter for commissions. The court said:

"If the plaintiff, upon the facts in this case, is entitled to a commission, it must be simply upon the ground that the sending of the parties to inspect the premises suggested to defendant a possible customer of his property. But, of course, such a position is entirely untenable. The broker must be the procuring cause of the sale; he must produce a customer ready and willing to enter into a contract upon the employer's terms, and the record does not contain even a suggestion that the plaintiff or his representative made any mention, at the time of the inspection or thereafter, to Mrs. Lipkin or her husband, as to the price or terms for which the house could be bought. The broker may have introduced to each other parties who otherwise would have never met; he may have created impressions which under later or more favorable circumstances would naturally lead to and materially assist in the consummation of a sale; he may have planted the very seeds from which others reap the harvest; but all that gives him no legal claim for commission."

In *Low* v. *Paddock,* (Mo. App.) 220 S. W. 969, 972, the broker saw one Matter and told him of the Paddock farm, its acreage, price, etc., with a view of inducing him to purchase it. Matter examined the property but did not buy, the price being more than he was willing to pay; but the same day he told his

father-in-law, Haley, the price at which the Paddock
farm could be bought, and Haley bought the farm
directly from Paddock.  The court said:

"The fact that his customer told Haley of the
Paddock farm could not, under the case presented,
be relied on by plaintiff to supplement his efforts.
*Warren* v. *Cram,* 71 Mo. App. 638, 641."

In *Clamp* v. *Patton,* (Tex. Civ. App.) 5 S. W. (2d)
584, 586, the broker offered his principal's herd of
cattle for sale to one Ramsey.  The latter did not
buy, but told one Finley of the cattle and their gen-
eral locality.  Finley and another bought the cattle
directly from the owner, paying a price in excess of
that at which the broker was authorized to sell them.
One of the purchasers before buying inquired of the
broker the name of the owner.  The court said:

"But the evidence quoted conclusively shows that
Patton did not find the purchaser, nor did he render
any service in consummating the sale when a pros-
pective purchaser appeared upon the scene, except,
in response to an inquiry from another acting for
the proposed purchaser as to the identity of the man
owning the cattle, he gave Clamp's name and told
where the cattle could be found.

"In our opinion it is wholly inadmissible to say
that the giving of this information, under the cir-
cumstances shown, is sufficient to show any service
rendered by Patton which would justly entitle him
to claim that he was the procuring or efficient cause
of the sale made by Clamp. 9 C. J., title 'Brokers,'
§§ 95, 96; *Burch* v. *Hester & Lawhorn,* (Tex. Civ.
App.) 109 S. W. 399."

In *Ritch* v. *Robertson,* 93 Conn. 459, 7 A. L. R. 81,
106 Atl. 509, 511, the broker's prospective purchaser
did not buy, but informed another who did purchase
the property directly from the owner without the
intervention of the broker, and there the court said:

"Ehlers approached the defendant entirely as an
original independent purchaser and secured his con-

tract in that guise. The general rule is stated in 9 C. J. 614, in this way:

" 'The facts that a person with whom the broker unsuccessfully negotiated for a sale called the attention of another to the property, and that the other finally bought it, do not give the broker a right to a commission.'

"This rule is based upon the well-established distinction between what the books call the *'causa causans'* and the *'causa sine qua non.'* The cases are numerous. We mention *Burchell* v. *Gowrie & Blockhouse Collieries,* 1910, A. C. 624; *Quirie* v. *Wilson,* 3 Dominion L. R. 826. In *Gleason* v. *Nelson,* 162 Mass. 245, 38 N. E. 497, it is said:

" 'Where there has been no direct communication between the broker and the purchaser, it must be shown affirmatively that the latter was induced to enter into the negotiations which resulted in the purchase through the means employed by the broker for that purpose.'

"We also cite *Johnson* v. *Seidel,* 150 Pa. 396, 24 Atl. 687; *Baumgartl* v. *Hoyne,* 54 Ill. App. 496. See, also, the citations in note Id., 44 L. R. A. 321."

Section 448, Real Estate Agency by Walker, (second edition), is as follows:

"A broker who negotiated with one person, who called the attention of another to the property, and that other bought from the vendor, or through another broker, is not entitled to commissions; to be entitled to commissions he must be the procuring cause and not merely a cause of causes. *Baumgarth* v. *Hayne* (*Baumgartl* v. *Hoyne*), 54 Ill. App. 496; *Gleason* v. *Nelson,* 162 Mass. 245, 38 N. E. 497; *Vandyke* v. *Walker,* 49 Mo. App. 381; *Burkholder* v. *Fonner,* 34 Neb. 1, 51 N. W. 293; *Johnson* v. *Seidal* (*Seidel*), 150 Pa. 396, 24 Atl. 687. See also Sec. 69.

"Under somewhat similar circumstances, in another state, a broker was held entitled to recover commissions. *Lincoln* v. *McClatchie,* 36 Conn. 136. See also *Carnes* v. *Finnegan* (*Finigan*), 198 Mass. 128, 84 N. E. 324."

In *Ritch* v. *Robertson, supra,* the court referred to the earlier case of *Lincoln* v. *McClatchie,* and said that it was decided upon the assumption of agency, and added:

"The felt necessity of invoking the doctrine of agency but confirms the general rule stated above."

The case of *Carnes* v. *Finigan, supra,* involved the right of a broker to collect commissions on the sale of a saloon. It seems the broker knew the Massachusetts Breweries Company was in the habit of advancing the money necessary to make purchases of barrooms when satisfied with the purchaser's responsibility and that he would buy his supplies from the brewery. Knowing this, the broker told one Casey, vice-president of the brewery company, that he had the place for sale, and Casey interested one Silva, who purchased the defendant's property, the company advancing the money to Silva to buy the place. These facts the court held established "a sufficiently close connection between his act and the sale to make out that he was the efficient cause thereof."

These two cases cited and relied upon by plaintiff at first blush apparently are without the general rule, which is that the broker must affirmatively show that his efforts were the procuring cause of the sale, but a closer examination of the facts and reasons given by the courts shows that while they are near the borderline they are not exceptions.

Without undertaking to analyze the other cases cited by plaintiff, we will state that the facts invariably show that the broker had some direct connection with the sale of his principal's property, such as introducing the purchaser to the seller, or by advertising, or by giving the principal the name of his customer as a possible purchaser, or by show-

ing the purchaser over the premises. In *Hafner* v. *Herron,* 165 Ill. 242, 46 N. E. 211, the broker not only found the purchaser, but introduced him to the principal before the sale was consummated. In *Shannon* v. *Potts,* 117 Ill. App. 80, the purchaser was initially represented by his father, who with the broker went upon the premises and examined them and subsequently spoke to the son of the land, "bragged" on it, and informed the son the broker had the agency to sell. The son, on the information received from his father in regard to the land, bought it from the owner ignoring the broker. Clearly the father in the examination of the land was acting for the son and by such agency brought the latter in contact with the broker. These two cases illustrate the character of the cases the plaintiff depends upon to show he was the procuring cause of the sale to Campbell-Francis Sheep Company, and none of them go as far as we would have to go to uphold the judgment in this case.

The evidence here clearly shows Bankhead was not acting for anyone but himself and, further, that plaintiff did not employ him as an instrument with which to effect the sale; that Bankhead went to the Miller ranch intending to purchase for himself and that when he failed to do so the Campbell-Francis Sheep Company, after acquiring other necessary feed and pasturage in the immediate neighborhood, purchased the Miller feed and pasturage without having been influenced thereto by plaintiff or by any means employed by him.

The evidence also indisputably shows that plaintiff was not the procuring cause of the sale. The court should have granted the defendant's request for an instructed verdict in its favor. Of course, if the evidence on this point was in dispute the solution of the question would properly have been left to the

jury. Since it was not in dispute, the court should have taken it from the jury.

The judgment is reversed and the cause remanded, with directions to dismiss the complaint.

LOCKWOOD, C. J., and McALISTER, J., concur.